JAMES S. COWARD ET AL. v. THE MAYOR AND COUNCIL OF BAYONNE ET AL.

ALVIN MOORE ET AL. v. THE MAYOR AND COUNCIL OF BAYONNE AND THE BOARD OF EDUCATION OF BAYONNE ET AL.

Argued June 10, 1901—Decided February 24, 1902.

1. The proceedings of a municipal corporation, with reference to the purchase of a site for the erection of a public school building thereon will not be set aside because not in accordance with the provisions of "An act to establish a system of public instruction" [Revision of 1900] (*Pamph. L., p.* 192), that act having been declared to be unconstitutional.

2. Where a prosecutor who seeks to set aside the proceedings of a municipality in purchasing lands has delayed suing out his writ of *certiorari* nearly a year after the resolution to purchase was passed, and more than eight months after the money was actually expended for the purchase, he is in laches, and the court will not consider the objections.

3. Where no statute requires a municipal board to advertise for proposals for doing work, such board may make such contracts without advertising, and if it does advertise, reserving a right to reject any or all bids, it may enter into any contract it deems best for the interests of the municipality, without reference to the advertisement.

4. If the advertisement for bids by a municipal body, to do work which that body is not required by law to advertise for, reserves the right to reject any or all proposals, and contains a clause that none but union labor shall be employed, a contract entered into not in accordance with the advertisement, and not containing that clause, will not thereby be vitiated.

5. Where a municipal body has by law discretion in awarding contracts, such contracts will not be set aside unless it appears that there is fraud or a palpable abuse of that discretion.

On *certiorari.*

Before Justices VAN SYCKEL, FORT and GARRETSON.

For the prosecutors, *De Witt Van Buskirk.*

For the defendants, *James Benny.*

The opinion of the court was delivered by

GARRETSON, J. Two cases have been argued together. The first writ brings up the proceedings of the mayor and council of the city of Bayonne, authorizing, or purporting to authorize, the issue of bonds of the city, and the appropriation of the proceeds for the construction of a public school building and the proceedings authorizing the expenditure of money for the purchase of lands in the erection of a public school building. The second writ brings up the proceedings of the board of education authorizing the acquisition of lands for the construction of a public school building and the preparation of plans for the construction of said school building, the advertisement for bids and the award of contracts for such construction, the application to the mayor and common council for the issue of bonds of said city and the appropriation of moneys for the construction of said building.

The writ seeks to set aside the proceedings of the board of education and the common council of Bayonne in purchasing a site for a public school and of the board of education in awarding a contract for the construction of a public school.

Reasons were assigned in both cases, claiming that the proceedings were void because they were not in accordance with the provisions of "An act to establish a system of public instruction" [Revision of 1900], approved March 23d, 1900. *Pamph. L., p.* 192. This act was declared unconstitutional by the Court of Errors and Appeals, and therefore these reasons cannot prevail.

Beginning January 2d, 1900, it appears from the return of the proceedings of the common council, conference was had between the finance committee of the council and a committee of the board of education as to the site for a public school, and two previous requests from the board of education to the council to issue bonds were made, and on May 15th, 1900, the board of education passed a resolution that the common council be requested to sell bonds to the amount of $12,000 to pay for lands and the cost of preparing plans and specifications and other preliminary expenses, and, on the same day, the common council passed a resolution ap-

propriating $12,000 to the board of education for the purchase of lands and other preliminary expenses for the construction of a school-house and authorizing the issue and sale of $12,000 of bonds for that purpose. The bonds were sold and the proceeds deposited in the city treasury, and on July 11th, 1900, a warrant was drawn for $8,500 to pay for the lands which the board of education had, by a resolution passed April 17th, 1900, agreed to purchase. The deed for the lands was recorded September 10th, 1900. If the prosecutors could not have removed the resolution of the 15th of April until the council had authorized the issue of bonds, yet, between the 15th of May, 1900, when the issue was authorized, and the 11th of July, when the money was drawn from the treasury to pay for the lands, the prosecutors had ample time to sue out a writ of *certiorari.* The writs in this case were issued one April 4th and one April 5th, 1901, both of them long after the money was paid out.

Much of the testimony is directed to the suitability of the site for school purposes. These writs come too late to justify this court in interfering with this purchase. *Grant* v. *Clark,* 9 *Vroom* 102; *Hoboken Land and Improvement Co.* v. *Hoboken,* 7 *Id.* 291; *Wilkinson* v. *Trenton,* 7 *Id.* 499; *Bowne* v. *Logan,* 14 *Id.* 421; *Provident Institution* v. *Jersey City,* 23 *Id.* 490.

The other reasons are directed against the awarding of the contract for the heating and ventilating of the building to be erected and the proceeding leading up to that award.

The statutory authority for the action of the board of education in making contracts is found in the charter of Bayonne (*Pamph. L.* 1872, *p.* 686, § 91), which provides that said board "shall have power to purchase real estate for school purposes and to erect buildings thereon when appropriations for those purposes are made by the mayor and council of said city." There is nothing in the charter or in any general law of the state requiring the board to advertise for proposals to do the work thus authorized. An act approved March 23d, 1899 (*Pamph. L., p.* 243), gives the authority to the common council to make the necessary appropriation

and authorizes Bayonne to appropriate for the above purposes a sum not exceeding $150,000.

The site cost, with preliminary expenses, $12,000; the contract for the building, exclusive of the heating and ventilating, was $57,300; the bid for heating and ventilating which was accepted was $11,128, making an aggregate of $80,428, which was well within the amount authorized to be appropriated.

At a meeting of the board of education held on the 7th of August, 1900, an architect was elected and instructed to prepare plans for the school building. These plans were submitted to the board on the 4th of September, 1900, and examined at that meeting, and at the subsequent meetings of September 10th, 25th, October 2d and 9th, and on the 9th of October the plans and specifications were adopted. On the 20th of November, 1900, direction was given to advertise in four newspapers named for bids to be received December 18th, 1900. Advertisements were inserted three times in the papers named, and, on that date, as no plans or specifications had been left in the custody of the president at the city hall, the time for receiving bids was extended to December 26th, 1900, and advertisement in one issue of each of the papers named was made that proposals would be received December 26th, 1900. On the 26th of December, 1900, six bids were received for the whole work, except heating and ventilating, ranging from $81,900 to $93,997, and five bids were received for heating and ventilating ranging from $14,993 to $16,375. The board rejected the bids as they had by their advertisement reserved the right to do, on the ground that they all exceeded the limit of $73,000, which had been set as the total cost of the building, and at the same meeting the architect was instructed to revise the plans and specifications and submit them to the board at its next regular meeting. A special committee was appointed to act in conjunction with the architect in revising the plans and specifications. This committee reported January 15th, 1901, and the report sets forth that committee with the architect had visited several schools and had gone over the plans and

specifications and made specific recommendations changing the building, so that the cost would be within the required amount. The recommendations were adopted. At a meeting held February 5th, 1901, the revised plans and specifications were examined and adopted and advertisement for bids to be received at the next meeting, February 15th, 1901, was ordered, and at the same meeting of February 5th it was determined that in the advertisement for proposals, contractors be notified "that none but union labor be employed on all branches." Advertisement was made in two issues of the above-mentioned paper, but no mention was made of the requirement of union labor. On the 15th of February the opening of bids was laid over until March 5th. Communications were received at this meeting, one protesting against building a school-house at so great cost in such a locality, and one from the board of health approving the plans, but recommending as to exits and mode of drainage. At the same meeting readvertisement for proposals to be received March 5th was directed. This advertisement was twice inserted in the same papers and contained the clause: "Contractors are notified that none but union labor shall be employed on all branches of the work." On the 5th of March proposals were received and opened. There were eight proposals for all work except heating and ventilating, ranging from $57,300 to $71,-921. There were six proposals for heating and ventilating, ranging from $8,380 to $12,420, and one bid for "Johnson Temperature Regulating Company, automatic heat regulation only, $1,550." The last advertisement contained a provision that "separate bids must be submitted for the heating and ventilating and for Johnson's system of heat regulation." The board awarded the contract for the building, exclusive of the heating and ventilating and automatic heat regulation, to Marcus Bolhardt, for $57,300, he being the lowest bidder, and the proposals for heating and ventilating were referred to the committee on building and repairs and the city attorney for the purpose of having a contract drawn and submitted to the lowest bidder for approval. At the meeting of March 19th, 1901, the board, in committee of the whole, considered

the proposals for heating and ventilating and adopted the report of the committee that the proposal of the Baldwin Engineering Company, which was the lowest, and for the sum of $8,480, be rejected, and the contract awarded to the Willis Heating and Ventilating Company for the sum of $11,128, provided the Willis Heating and Ventilating Company sign and execute the contract submitted to the Baldwin Engineering Company, and by that company disapproved. The bid of $11,128 was the bid next higher than that of $8,480. The Willis company executed the contract and this is the contract sought to be set aside.

The specifications for heating and ventilating require "five No. 71 Willis return tubular heaters complete." They also required from the contractor a guarantee that the apparatus would, with good care exercised on the part of the owner, warm all rooms in the said building, in accordance with the arrangement shown on the plan (said plans to be made a part of the contract) to an average temperature of seventy degrees Fahrenheit in the coldest weather, and the corridors and toilet-rooms to sixty-five degrees Fahrenheit. The contract required that the essence of this contract is the heating of all the rooms in the building to an average temperature of seventy-five degrees Fahrenheit, and the corridors and toilet-rooms to seventy degrees Fahrenheit in every kind of weather, without regard to how low the temperature outside of the building may be. The contract also contains stringent provisions to enforce this latter agreement and the agreement as to ventilating. It was a better contract for the city than one strictly following the specifications would have been.

It also appears from the evidence that the Baldwin company had figured on a different system of heating the school than was specified, and their representative asked to be relieved from the contract; that he had figured on a different plant altogether than that specified or that wanted, and said they could not put in the plant specified at the figure they bid. The Baldwin company is not now asserting any right to be awarded the contract.

The board of education of Bayonne is not required by the charter of that city or by any general law of the state to advertise for proposals for doing any of the work which they are authorized to do. The only provision is in section 91 of the charter, *supra,* and, although the board did actually advertise for proposals, they were not required to award the contract to the lowest bidder, and the award of the contract to a higher or the highest bidder, or to someone who did not bid at all, would not, in the absence of bad faith and corruption, be regarded as such an abuse of that discretion conferred upon them by law as to justify interference by this court. The employment of an architect to prepare plans and specifications and the soliciting of bids may have been a proper method of ascertaining the most favorable contract that could be obtained for the city. It is the method which a private person would pursue as to his own affairs; and after the bids had been received there was nothing to prevent the board from so modifying the specifications that a better contract might be made for the city. The board had the right to purchase for use in the building any article or apparatus of a specific make, even though it was patented or the product of an exclusive manufacture. *Newark* v. *Bonnell,* 28 *Vroom* 424.

Nor do we think that a statement in the advertisement that only union labor should be employed, such a condition not being contained in the contract, would vitiate the contract.

The evidence fails to disclose that the board of education had any motive in awarding the contract other than that of making the best bargain possible for the city. We think that they exercised the discretion conferred upon them by law with good faith and honesty. *Ryan* v. *Paterson,* 37 *Vroom* 533; *Oakley* v. *Atlantic City,* 34 *Id.* 127; *Van Reipen* v. *Jersey City,* 29 *Id.* 262.

The proceedings of the common council and the board of education should be affirmed, with costs.